# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

JUAN ORTIZ,                              :
                                         :
                Petitioner,              :
                                         :
        v.                               :        Civil Action No. 13-1176-LPS
                                         :
DANA METZGER, Warden, and                :
ATTORNEY GENERAL OF THE                  :
STATE OF DELAWARE,                       :
                                         :
                Respondents.[1]          :

---

## **MEMORANDUM OPINION**

Samuel J. B. Angell, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, Philadelphia, Pennsylvania.

> Attorney for Petitioner

Andrew J. Vella, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.

> Attorney for Respondents

February 23, 2021
Wilmington, Delaware

---

[1] Warden Dana Metzger replaced former Warden Perry Phelps, an original party to the case. *See* Fed. R. Civ. P. 25(d).

STARK, U.S. District Judge:

## I.     INTRODUCTION

Presently pending before the Court is Petitioner Juan Ortiz's ("Petitioner") Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Petition"). (D.I. 17)  The State filed an Answer in opposition, to which Petitioner filed a Reply. (D.I. 28; D.I. 34)  For the reasons discussed, the Court will dismiss the Petition.

## II.    BACKGROUND

As summarized by the Delaware Supreme Court in Petitioner's direct appeal, the facts leading up to his arrest and conviction are as follows:

> Deborah Clay entered into a romantic relationship with [Petitioner] in 2001.[2]  Deborah was forty-one years old in July of that year.  In March 2001, [Petitioner] moved into Deborah's home.  At that time, Deborah's fifteen-year-old daughter, Ashley, was living with Deborah.
>
> [Petitioner] stayed with Deborah and Ashley from March 19, 2001 to May 29, 2001.  During that time, [Petitioner] was under home confinement by the Delaware Department of Corrections.  His monitoring device was located in the back bedroom of Deborah's home.  [Petitioner] left for a few months and returned to Deborah's home on June 26, 2001.  On July 4, Ashley heard Deborah tell [Petitioner] he had to move out of her home by that Sunday.
>
> The next evening, July 5, Ashley tried to open the door to her mother's bedroom, but the door was locked.  [Petitioner] was in that bedroom.  When he unlocked the door, Ashley noticed Deborah's waterbed was deflated.  [Petitioner] was upset and crying.  He told Ashley that he tried to shoot himself but missed and shot the waterbed.  [Petitioner] said that he was going to have Deborah take him to a mental institution.
>
> Later that night, around 11:00 p.m., when Ashley returned home, [Petitioner] appeared normal.  Ashley then called her mother to ask

---

[2]Petitioner disputes the Delaware Supreme Court's description about his relationship with Deborah beginning in 2001.  Instead, he asserts that they had a longstanding relationship for many years, which led to their engagement in 2001. (D.I. 34 at 1 n.1)

permission to go out with her friends. Deborah did not want Ashley to go out because Deborah feared being alone with [Petitioner] at her home. Deborah also requested Ashley to tell [Petitioner] that "he still had to be out by Sunday."

Deborah's son, Brock Prichett, who was twenty-seven years old, owned a 6 mm rifle and a 12-gauge bolt-action shotgun. Deborah and [Petitioner] stored those guns for Brock at Robert Cox's house. Brock requested possession of his guns a few days before July 6. On July 5, 2001, [Petitioner] obtained the guns from Cox around 7:00 a.m. When Brock asked [Petitioner] about his guns later that same evening, however, [Petitioner] told Brock that he was not able to get in touch with Cox.

The next day, July 6, 2001, Ashley found [Petitioner] at home around noon. He told Ashley that he and her mother had not spoken the night before and that "all hell was going to break loose when [Deborah] got home . . . ." That same afternoon, Deborah had called her friend, Amy Rust, around 2:00 or 2:30 p.m. from Mike Ratledge's house. Deborah called Rust later at 3:15 p.m. from her own home and told Rust she was about to get into the shower. She requested that Rust pick her up because she was late for work.

Tonya Russell, a neighbor of Deborah's, testified that on the afternoon of July 6, she saw [Petitioner] leave Deborah's residence, get into his truck, and go back inside the home. According to Russell, [Petitioner] was inside the residence for approximately three minutes and then left very quickly. Russell noticed smoke coming from Deborah's home about fifteen to twenty minutes after [Petitioner] left. Russell knocked on Deborah's bedroom window and the back door. After hearing no response, Tonya called 911 at 3:32 p.m. When Amy Rust arrived at Deborah's home, it was on fire. Firefighters and fire trucks were already on the scene.

As the firefighters were extinguishing the fire, they discovered the body of a female in the bathroom. The body appeared to have been decapitated. The female body was Deborah Clay's. An autopsy revealed that Deborah had been shot in the lower right abdomen and also had sustained a fatal shot to the right side of her head above her ear.

The Delaware State Police also responded to the scene of the fire at Deborah's home. On top of the washing machine, in an alcove adjacent to the bathroom, the police discovered three pillows that were duct-taped together. The pillows had a hole in them that corresponded to a hole found in the paneling between the hall and

2

the shower. Inside the pillows, police found half of a Sabot slug and also located two shotgun wads in the bathroom. The police found a hole in the shower stall that was about 22 inches from the top of the tub. It was estimated that Deborah was standing about 25 inches away from the wall when she was shot while standing in the shower.

The Chief Deputy Fire Marshall concluded that the fire at Deborah's home had been started intentionally by an open flame. He also determined that two fires had been set: one in the center bedroom and one in the rear bedroom. The police found a burned 12-gauge shotgun in one of the bedrooms.

The police located [Petitioner] near Millsboro and took him into custody without incident. Among other things, police found an orange Philadelphia Flyers cigarette lighter. [Petitioner] told the police that the weapon he used to shoot Deborah was in her trailer. [Petitioner] stated that he was angry with Deborah and fired the shotgun at her from behind the wall while she was in the shower. [Petitioner] claimed that he thought the gun was "on safe." He then stated that he went to the bathroom, saw Deborah holding her side, and dropped the gun which went off when he dropped it. He ran from the house and traveled to the home near Millsboro, where he was eventually arrested.

*Ortiz v. State*, 869 A.2d 285, 289-90 (Del. 2005), *overruled by Rauf v. State*, 145 A.3d 430 (Del. 2016).

In July 2003, a Delaware Superior Court jury found Petitioner guilty of first degree murder, possession of a firearm during the commission of a felony ("PFDCF"), and second degree arson (lesser included offense of first degree arson). The trial court conducted a seven-day penalty hearing, after which the jury voted 11-1 in favor of death. (D.I. 28 at 4) On September 25, 2003, the Superior Court granted the State's motion to declare Petitioner a habitual offender, denied Petitioner's motion for a new penalty hearing, and sentenced Petitioner to death for the murder conviction and to a term of years for his weapon and arson convictions. The Delaware Supreme Court affirmed Petitioner's convictions and sentence on January 25, 2005. *See Ortiz*, 869 A.2d at 311. The United States Supreme Court denied Petitioner's petition for a writ of certiorari on October 5, 2005. *See Ortiz v. Delaware*, 546 U.S. 832 (2005).

On August 31, 2006, Petitioner's post-conviction counsel filed his first motion for post-conviction relief pursuant to Delaware Superior Court Criminal Rule 61; counsel filed an amended Rule 61 motion on June 19, 2007 (hereinafter referred to as "Rule 61 motion"). (D.I. 28 at 5)  The State filed an Answer, and the Superior Court held evidentiary hearings on various dates beginning in April 2009 and concluding in July 2011. (D.I. 28 at 5)  After post-hearing briefing by the parties, the Superior Court denied Petitioner's first Rule 61 motion on January 15, 2013. (D.I. 17-1 at 2-46)

Petitioner appealed the denial of his Rule 61 motion.  However, before any opening brief was submitted in support of that appeal, the attorney representing Petitioner on post-conviction appeal was suspended from the practice of law.  Petitioner's new post-conviction counsel moved to remand the case to allow new counsel to review the record and submit amended or new claims to the Superior Court in the first instance. (D.I. 28 at 5)  The Delaware Supreme Court granted Petitioner's motion in March 2014, and remanded the matter to the Superior Court. *Id.*  On remand, Petitioner filed a "Supplemental Petition for Post-Conviction Relief" in August 2014 ("supplemental Rule 61 motion").  The State responded (D.I. 32-9), the Superior Court held additional hearings, and the parties filed post-hearing pleadings.  On October 28, 2015, the Superior Court denied Petitioner's supplemental Rule 61 motion, relying in part upon its reasoning from its decision to deny Petitioner's first Rule 61 motion, and reissued the order on November 4, 2015 to correct an omission of language from the original order. (D.I. 17-1 at 48-59)

Petitioner appealed the denial of his supplemental Rule 61 motion.  On January 30, 2017, the Delaware Supreme Court stayed the appeal and remanded the case for resentencing in light of its decisions in *Rauf v. State*, 145 A.3d 430 (Del. 2016), and *Powell v. State*, 153 A.3d 69 (Del. 2016).  On February 21, 2017, the Superior Court vacated Petitioner's death sentence and re-sentenced him to life without the possibility of parole, probation, or any other reduction, as mandated by the

Delaware Supreme Court.  (D.I. 28 at 6)  The case returned to the Delaware Supreme Court on March 23, 2017.  By order dated January 11, 2018, the Delaware Supreme Court affirmed the Superior Court's judgment denying Petitioner's first and second Rule 61 motions.  (D.I. 17-1 at 61; *see also Ortiz v. State*, 177 A.3d 1235 (Table), 2018 WL 388642 (Del. Jan. 11, 2018)).

While Petitioner's first Rule 61 appeal was pending before the Delaware Supreme Court in July 2013, Petitioner filed in this Court a Motion for the Appointment of Federal Habeas Counsel so that he could file a petition for a writ of habeas corpus.  (D.I. 1)  The Court granted the Motion, and the federal habeas case was stayed while Petitioner exhausted state court remedies.  (D.I. 4; D.I. 13)  On February 12, 2018, after the Delaware Supreme Court affirmed the denial of Petitioner's first and second Rule 61 motions, Petitioner filed a Motion to Lift the Stay along with his Petition for Writ of Habeas Corpus.  (D.I. 16; D.I. 17)  The Court granted the Motion to Lift the Stay.  (D.I. 18)  The State filed an Answer, to which Petitioner filed a Reply.  (D.I. 28; D.I. 34)

## III.   STANDARD OF REVIEW

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d).  Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial.  28 U.S.C. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).  A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground.  *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).

The deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). As explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99. This "presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99-100.

When reviewing a habeas claim, a federal court must presume that the state court's determinations of factual issues are correct. *See* 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## IV.   DISCUSSION

Petitioner asserts that his trial counsel provided ineffective assistance by: (1) failing to have Dr. Mechanick re-evaluate Petitioner closer to the start of the trial and failing to obtain funding to enable that re-evaluation; and (2) failing to impeach Amy Rust and Mike Rutledge, the witnesses the prosecution presented to rebut the evidence that Petitioner was under extreme emotional distress ("EED") at the time of the shooting.

In both its original Rule 61 decision and its remanded Rule 61 decision, the Superior Court explicitly denied as meritless Petitioner's ineffective assistance of counsel argument in Claim One regarding defense counsel's presentation of the EED defense. (D.I. 17-1 at 12-21, 50-52) The Delaware Supreme Court affirmed those decisions and adopted the reasoning of both. (D.I. 17-1 at

61) Therefore, the Court will treat both of the Superior Court's opinions as the last reasoned decisions for Claim One and review Claim One under AEDPA's deferential standard of review.[3] *See, e.g., Wilson v. Sellers*, 138 S.Ct. 1188, 1193-95 (2018) (explaining that, in § 2254 context, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning").

Petitioner contends that the Court must review Claim Two *de novo*, because "there is no state court decision on these issues for this Court to give deference." (D.I. 34 at 8)  The Court disagrees. Petitioner presented Claim Two to the Superior Court on remand in his supplemental Rule 61 motion filed on August 15, 2014.  (D.I. 32-8 at 6)  When the Superior Court denied the supplemental rule 61 motion on November 4, 2015, it addressed Claim Two in the following manner:

> In connection with this issue [*i.e.*, the new evidence of Dr. Mechanick's 2013 expert opinion], [Petitioner] also argues that this trial counsel failed to argue other evidence at trial in support of an EED defense, ***failed to impeach two witnesses***, and that the cumulative effect of the EED related factors constituted ineffectiveness.
>
> I find that even if Dr. Mechanick's EED opinion was available in 2003 ***and the factors mentioned in the preceding paragraph had***

---

[3]The Delaware Supreme Court affirmed the Superior Court's judgment "on the basis of and for the reasons assigned in its opinion dated November 4, 2015 and its letter opinion dated February 15, 2017." *Ortiz*, 2018 WL 388642, at *1.  The Superior Court's Opinion dated November 4, 2015 denied Petitioner's Rule 61 motion and supplemental Rule 61 motion, and also referenced its earlier January 15, 2013 Opinion denying Petitioner's original Rule 61 motion.  The Superior Court's Letter Opinion dated February 15, 2017 denied Petitioner's motion to be sentenced as a Class A felon and denied his motion for leave to file an *ex parte* motion.  (D.I. 32-2 at 104-05)  Since the Delaware Supreme Court explicitly adopted the reasoning of the Superior Court in both Rule 61 decisions when it denied Petitioner's original and supplemental Rule 61 motions, the Court will look to both of the Superior Court decisions when analyzing Petitioner's habeas Claims under *Strickland*.  As such, the Court will refer to the Superior Court rather than the Delaware Supreme Court in its discussion.

7

> **been pursued at trial,** [Petitioner] cannot establish prejudice as that
> term is used under *Strickland.*

(D.I. 17-1 at 51) (emphasis added)  Given the Superior Court's explicit reference to Claim Two's

"failure to impeach two witnesses" argument, and for the reasons just discussed with respect to the

standard of review applicable to Claim One, the Court will treat the Superior Court's November

2015 opinion as the last reasoned decision for Claim Two and review Claim Two under AEDPA's

deferential standard of review.  In short, Petitioner will only be entitled to relief if the Superior

Court's denial of Claims One and/or Two was either contrary to, or an unreasonable application of,

clearly established federal law, or an unreasonable determination of the facts based on the evidence

presented in the Rule 61 proceedings.

The Supreme Court precedent governing ineffective assistance of counsel claims is the two-

pronged standard enunciated by *Strickland v. Washington,* 466 U.S. 668 (1984), and its progeny.  *See*

*Wiggins v. Smith,* 539 U.S. 510 (2003).  Under the first *Strickland* prong, a petitioner must demonstrate

that "counsel's representation fell below an objective standard of reasonableness," with

reasonableness being judged under professional norms prevailing at the time counsel rendered

assistance.  *Strickland,* 466 U.S. at 688.  Under the second *Strickland* prong, a petitioner must

demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is a

"probability sufficient to undermine confidence in the outcome."  *Id.*  A court can choose to address

the prejudice prong before the deficient performance prong, and reject an ineffective assistance of

counsel claim solely on the ground that the defendant was not prejudiced.  *See Strickland,* 466 U.S. at

698.

In order to sustain an ineffective assistance of counsel claim, a petitioner must make

concrete allegations of actual prejudice and substantiate them or risk summary dismissal.  *See Wells v.*

*Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987).

Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong

presumption that counsel's conduct falls within the wide range of reasonable professional

assistance." *Strickland*, 466 U.S. at 689.

 With respect to the first prong of the § 2254(d)(1) inquiry, a "state court decision is contrary

to clearly established federal law if it applies a rule that contradicts the governing law set forth in

Supreme Court precedent, or if it confronts a set of facts that are materially indistinguishable from a

decision of [the Supreme] Court and nevertheless arrives at a result different from that reached by

the Supreme Court." *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Here, since the Superior

Court correctly identified the *Strickland* standard applicable to both Claims in this case, the Superior

Court's decisions were not contrary to *Strickland. See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill

state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a

prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.").

 The Court must also determine if the Superior Court reasonably applied the *Strickland*

standard to the facts of Petitioner's case. When analyzing this second prong of the § 2254(d)

inquiry, the Court must review the Superior Court's decision with respect to Petitioner's ineffective

assistance of counsel Claims through a "doubly deferential" lens.[4] *See Richter*, 562 U.S. at 105. The

relevant question when analyzing counsel's performance under the "doubly deferential lens" "is not

---

[4]As explained by the *Richter* Court,

> [t]he standards created by *Strickland* and § 2254(d) are both "highly
> deferential," and when the two apply in tandem, review is doubly so.
> The *Strickland* standard is a general one, so the range of reasonable
> applications is substantial. Federal habeas courts must guard against
> the danger of equating unreasonableness under *Strickland* with
> unreasonableness under § 2254(d).

562 U.S. at 105 (internal citations omitted).

whether counsel's actions were reasonable, [but rather] whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* In turn, when assessing prejudice under *Strickland*, the question is "whether it is reasonably likely the result would have been different" but for counsel's performance, and the "likelihood of a different result must be substantial, not just conceivable." *Id.* Finally, when viewing a state court's determination that a *Strickland* claim lacks merit through the lens of § 2254(d), federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101.

### A. Claim One: Ineffectiveness Of Counsel For Failing To Have Dr. Mechanick Re-Evaluate Petitioner And Failing To Obtain Funding For That Re-Evaluation

In Claim One, Petitioner contends that trial counsel provided ineffective assistance because they did not have Dr. Stephen Mechanick conduct an updated evaluation of Petitioner closer to trial so that he could present available additional evidence to support Petitioner's defense that the homicide occurred while he was under extreme emotional distress ("EED"). Petitioner also asserts that defense counsel were ineffective for failing to seek additional funding in order to have Dr. Mechanick perform a re-evaluation closer to trial.

#### 1. Relevant background facts

The following facts provide important background information relevant to the Court's analysis of Claim One.

Petitioner's defense attorneys, Lloyd Schmid and Deborah Carey, retained two mental health experts to evaluate Petitioner prior to trial: Dr. Stephen Mechanick, a psychiatrist, and Dr. Abraham Mensch, a psychologist. (D.I. 17 at 16)  Dr. Mechanick performed a four-hour psychiatric exam of Petitioner on November 9, 2001. (D.I. 17-1 at 17; D.I. 32-9 at 4)  Dr. Mensch performed a six- or seven-hour psychological evaluation of Petitioner on November 10, 2002. (D.I. 17-1 at 17; D.I. 32-9 at 6)  Both experts performed the exams for the purpose of making a psychological determination

of the appropriateness of any mental defense. (D.I. 17-1 at 17; D.I. 32-9 at 6)  However, given

Petitioner's claim that both discharges of the gun were accidental, neither expert felt the facts as

originally described by Petitioner were sufficient to support an EED defense. (D.I. 19-5 at 239, 700;

D.I. 19-7 at 9)

Petitioner changed his story about the shooting several times between November 2001 and

March 2003. (D.I. 19-4 at 272)  After considering Petitioner's March 2003 version of the shooting,

the defense team arranged to have Dr. Mensch re-evaluate Petitioner, this time with the specific

purpose of determining if there were sufficient facts to support an EED defense as well as the

theory of abandonment homicide. (D.I 19-4 at 229, 230, 236, 249)  Dr. Mensch met with Petitioner

on May 31, 2003 for three to four hours (D.I. 17-1 at 13; D.I. 19-4 at 30), and after that meeting still

had doubts as to whether EED was a viable defense (D.I. 19-5 at 259).  Neither Dr. Mensch nor Dr.

Mechanick issued written reports with respect to their evaluations.

Dr. Mensch testified at the penalty phase of the criminal proceeding regarding the defense of

abandonment homicide; his testimony was limited to mitigation and the theory of abandonment

homicide, with a focus on intermittent explosive disorder. (D.I 17 at 13; D.I. 19-4 at 58-60, 80-84,

86-88, 100-04)  Dr. Mensch also testified at Petitioner's Rule 61 hearing in July 2010.  Referencing

his notes from 2002 and 2003, he explained that Petitioner had told him two different versions of

the shooting.  In his first version, Petitioner said the shooting was accidental, and that "the gun

discharged by dropping it on the floor the second time which, certainly, that's not how my shotgun

works." (D.I. 19-5 at 299)  Petitioner's second version indicated that the shooting was more

intentional; "not so much shooting her, but shooting at her. [Petitioner] was very angry.  He still

didn't recall, you know, how he – the second round was chambered, but said that he must have done

it." (D.I. 19-5 at 299)  Dr. Mensch explained that his difficulty in presenting an EED defense was

that "a shotgun doesn't discharge a second time just by dropping it, unless it's an automatic." (D.I. 19-5 at 300)  However, Dr. Mensch explained that when the information he learned following the penalty hearing – namely, that Petitioner had a history of early lead poisoning and intrauterine alcohol exposure – is viewed in conjunction with a documented low frustration tolerance, one "can see that as part of the same actions, the two shots were connected." (D.I. 19-5 at 300)  When asked to opine if Petitioner's obtaining the shotgun prior to the shooting, jerry-rigging "a silencer on the shotgun, tying pillows around the shotgun, and firing that into the waterbed" was part of the EED or something else, Dr. Mensch stated that "planning doesn't necessarily negate the EED because you can be under distress for a very long time." (D.I. 19-5 at 701-02)  Dr. Mensch did not re-examine Petitioner during the original or remanded Rule 61 proceeding.

Dr. Mechanick did not testify at Petitioner's criminal trial.  During Petitioner's Rule 61 hearing in 2009, Dr. Mechanick explained that he had been retained in 2001 to evaluate, among other issues, "whether extreme emotional distress would apply, issues regarding guilty but mentally ill," and "issues related to mitigation." (D.I. 19-5 at 10)  He testified that, when he interviewed Petitioner in November 2001, he did not believe that EED was applicable because Petitioner "claimed at that time that both discharges of the gun were accidental." (D.I. 19-5 at 700)  He also explained that, "based on [his] review of the records and [Petitioner's] representation to [him] at that time about what had occurred and how it had occurred, [he informed Ms. Zervas in the PD's office in 2001] that [Petitioner's] actions would not meet [his] understanding of the Delaware statute for mental illness defense or extreme emotional defense." (D.I. 19-5 at 11)  Dr. Mechanick stated he also informed the defense team that Petitioner's childhood problems and emotional problems over the course of his life "might be relevant to discuss should the case go to sentencing." *Id.* More specifically, he stated:

> Well, at that point, I thought I could testify potentially regarding
> mitigation based on the information that I had. Again, the version of
> events that I had before me, provided by [Petitioner] at that point,
> was that the two discharges of the gun had been accidental and
> without any specific intent.

(D.I. 19-5 at 11) Ms. Zervas informed Mr. Schmid and Ms. Carey about Dr. Mechanick's conclusion

via an email dated November 13, 2001. (D.I. 19-7 at 9)

Dr. Mechanick was deposed on May 12, 2011. During this deposition, Dr. Mechanick again

stated that, based on his review of the documents and the information he had at the time of his

original examination of Petitioner in 2001, he still could not conclude with a reasonable degree of

certainty that Petitioner was under EED when he shot the victim. (D.I. 19-5 at 338-39) He also

reviewed an email that Ms. Zervas sent to him and Dr. Mensch on March 21, 2003, asserting the

following:

> [Petitioner] is, quote, now indicating that he did deliberately shoot
> through the bathroom wall and reportedly used a pillow to buffer the
> sound. He was reportedly surprised it hit her, and then shot her
> again. He was very upset that she was going to leave him. She was
> not going to let him see her daughter anymore. She said that right
> before the first shot was fired, and that she was having an affair. He
> had followed her and saw her having sex with someone that morning.
> I am wondering what you think about his abandonment/attachment
> /dependency issues[]? . . . [O]r if this new info would change your
> ideas about using EED?

(D.I. 19-5 at 341-42; D.I. 19-7 at 16) When asked if he attempted to reach a conclusion about EED

on the basis of the email, Dr. Mechanick replied:

> Well, I guess the answer is: Yes, I considered it and I evaluated it. I
> didn't believe there was enough from simply the content of what [Ms.
> Zervas] related to me in this e-mail to reach a conclusion that he had
> EED. Obviously, up to this point, there were some conflicting
> accounts about what occurred and why. But it certainly reintroduced
> the possibility of extreme emotional distress as a potential defense in
> my mind. But I don't believe I reached a conclusion that based on
> this e-mail he had EED.

13

(D.I. 19-5 at 347-48)  Dr. Mechanick was presented (D.I. 19-5 at 349) with another email, dated

April 24, 2003, from Ms. Zervas to Mr. Schmid and Ms. Carey, which states that:

> I talked to Steve Mechanick today re [Petitioner] – and his
> reevaluation of the date he has on him – paying attention to the
> dependency/attachment/abandonment issues. . . .  He said that he
> did not feel it reached the level of EED for a defense nor does he
> meet the criteria for either mental defense, but he did think he could
> explain these factors for mitigation during sentencing phase.

(D.I. 19-7 at 22; *see also* D.I. 19-5 at 349)  When asked if or how he conducted such a reevaluation,

and whether he considered Ms. Zervas' March 21, 2003 email during that reevaluation, Dr.

Mechanick replied:

> I think what I did was review[] the materials that I had had previously
> in 2001, as well as notes from my examination of [Petitioner in 2001]
> following the March 2003 memo from Ms. Zervas; so that's what I
> believe I would be referring to.   It's really more of a review, with
> some reevaluation as well.
>
> ***
>
> What I would say is that I don't believe that simply the e-mail
> transmission about that version of events that – combined with what
> I had up to that point would have reached the – crossed the
> threshold where I believe that I could have reached the opinion that
> he had EED.

(D.I. 19-5 at 349-50)

Ten years later, on December 16, 2013, Dr. Mechanick re-examined Petitioner as part of the

defense presentation in Petitioner's remanded Rule 61 proceeding.   (D.I. 32-9 at 4)  He issued a

thirty-four page psychiatric evaluation of Petitioner on August 26, 2014, which included the

following conclusion:

> Based on the information that [Petitioner] provided me on December
> 16, 2013, and my review of available records, it is my opinion that
> [Petitioner] was experiencing Extreme Emotional Distress (EED at
> the time of the July 6, 2001 crime.  It is my opinion that [Petitioner's]

14

EED was caused by a number of external stresses for which he was not responsible.

(D.I. 19-5 at 701)  In reaching that conclusion, Dr. Mechanick explained:

> When I interviewed [Petitioner] on November 9, 2001, I did not believe that he accurately provided information about the crime and the circumstances leading up to the crime.  Since [Petitioner] claimed at that time that both discharges of the gun were accidental, I did not believe at that time that Extreme Emotional Distress was applicable.
>
> It is my opinion that [Petitioner] was more honest and forthcoming when I interviewed him on December 16, 2013.  The information that [Petitioner] provided during my December 16, 2013 interview was also consistent with the police records, testimony, and information contained in Dr. Mack's report and testimony.
>
> [Petitioner's] account of the crime when Dr. Mensch reexamined him on May 31, 2003 is consistent with the information that [Petitioner] provided to me on December 16, 2013.  It is my opinion that, if I had reexamined [Petitioner] on or about the time of Dr. Mensch's May 31, 2003 examination, [Petitioner] would have provided information to me at that time that was similar to and consistent with what he told me on December 16, 2013.  It is my opinion that, if [Petitioner] had provided me with that information, I would have reached the same opinions at the time of trial that I am stating in my current report.

(D.I. 19-5 at 700)  Dr. Mechanick stated that it was his opinion that Petitioner also had an antisocial personality disorder at the time of the crime, but that the disorder was not the cause of his EED. (*Id.* at 702)

Dr. Mechanick was deposed on September 2, 2014.  During his deposition testimony, he expressed opinions about Petitioner's EED and anti-social personality disorder which were similar to the written statements in his August 26, 2014 psychiatric report.  (D.I. 19-6 at 7-125)

In 2007 and 2008, post-conviction counsel retained Dr. Jonathan Mack, a psychologist and neuropsychologist, to evaluate Petitioner for his original Rule 61 proceeding.  (D.I. 19-5 at 588)  Dr. Mack issued a written Neuropsychological and Psychological Evaluation of Petitioner on July 18,

2011 (D.I. 19-5 at 588-624), and he testified at Petitioner's Rule 61 hearing on July 21, 2011 (D.I. 19-5 at 399-586). It was Dr. Mack's opinion that Petitioner was under EED at the time of the homicide, and that Petitioner has a number of psychological traits that predispose him to extreme emotional reactivity and discontrol of aggression and anger. (D.I. 19-5 at 474)

Dr. Victoria Reynolds, a clinical psychologist, interviewed Petitioner in prison in December 2013 and prepared a Psychological Report of Trauma and Its Impact: Juan Ortiz in June 2014. (D.I 32-11 at 21) Dr. Reynolds testified by telephonic deposition in September 2014 as part of the remanded Rule 61 proceeding. (*Id.*)

### 2. Petitioner's different versions about the shooting

Petitioner provided the following different accounts of the circumstances surrounding the shooting. Since the record does not contain Dr. Mechanick's or Dr. Mensch's actual notes from the 2001-2003 period, the versions provided below are descriptive statements from other sources, either Rule 61 testimony or the reports written by other experts.

### a. 2001 version provided to Dr. Mechanick

[Petitioner] stated that Debbie told him in approximately March 2001 that she was having an affair with a man named Mike. He stated that he had been friendly with Mike. [Petitioner] stated that he felt angry with Debbie, and he started seeing another woman named Stacy. He stated that he committed to stay with Debbie because he was on a home monitor.

[Petitioner] stated that he did not have his medications during the spring of 2001, and he could not sleep unless he drank alcohol. He stated that he drank enough to go to sleep.

[Petitioner] stated that he wanted to leave Debbie, but he did not know how to do it. He stated that he and Debbie talked, and they decided that he would move out. He stated that he continued to see Stacy when he went to work. [Petitioner] stated that his drinking increased, and he started drinking from sunrise to sundown every day. He stated that he drank sixty beers a week, and he started

16

drinking tequila as well.  [Petitioner] stated that Debbie was drinking and using cocaine and crank (amphetamines).

[Petitioner] stated that he was incarcerated for three weeks for a violation of probation, when he went to a bar on July 4, 2001, and he smoked marijuana with Debbie, Ashley, and Ashley's boyfriend.  He stated that he had gone to the bar to see Debbie.  [Petitioner] stated that he felt upset when he saw Mike's car at the bar, and he went to a liquor store and bought alcohol.

[Petitioner] stated that he went to the bar where Debbie worked when he got out of prison on a Friday.  He stated that Debbie said that she wanted to work things out with him.  [Petitioner] stated that he and Debbie made love when she came home that night

[Petitioner] stated that he and Debbie went out dancing the next night.  He stated that they went to the beach, where his truck became stuck.  [Petitioner] stated that his tools were stolen when he went to make a phone call.

[Petitioner] stated that it seemed like he could not do anything right with Debbie over the next two weeks.  He stated that Debbie kept arguing with him and hitting him.  [Petitioner] stated that Debbie held a steak knife at him one time, and he cut his palm when he grabbed the knife.

[Petitioner] stated that Debbie got upset when he had his children come to her house.  He stated that, because he had a charge of unlawful sexual conduct, he was not allowed to be around children, and he could not live with women who had children at home. [Petitioner] stated that he stopped bringing his children to Debbie's home to visit because Debbie was angry with him.

[Petitioner] stated that he bought a truck, with the thought that he could drive into the woods and blow his head off.  He stated that he shot the waterbed in Debbie's home, and then he worried about how Debbie would react.

[Petitioner] stated that he and Debbie went to his father's home for a cookout (on July 4, 2001).  He stated that Debbie left for a few hours, and he thought that she had gone to see another man.

[Petitioner] stated that he spoke with Susan Borntreger on July 4, 2001, and he told Susan that he needed help.  (Susan Borntreger was another woman with whom Petitioner had had a relationship.)

[Petitioner] stated that he also called the state hospital, but he hung up the phone when no one answered the call.

[Petitioner] stated that he was supposed to start a new job for a company named Arrowhead on July 5, 2001. He stated that he and Debbie argued that morning. [Petitioner] stated that he left for work, and Debbie called his cell phone. He stated that he cried in his truck, and decided not to go to work.

[Petitioner] stated that Debbie's son, Brock, had asked him to pick up Brock's shotguns from the house of a friend named Bobby. He stated that he got the shotguns and brought the guns home on July 5, 2001. [Petitioner] stated that he stopped at his brother-in-law's house, where he kept several cars. He stated that he moved the cars, and he cut the grass.

[Petitioner] said that he arrived back at Debbie's house around 12:00. He stated that Debbie got up at 2:00 and yelled at him for not having gone to work. [Petitioner] stated that he cleaned the house, and he made a special dinner for Debbie.

[Petitioner] stated that Debbie left and took a shower when she returned home. He stated that Debbie threw her plate of dinner in the sink. [Petitioner] stated that Debbie started in on him about "old shit."

[Petitioner] stated that Debbie's daughter, Ashley, came home in the morning on July 6, 2001. He stated that Debbie started "snapping" at him, and he told Ashley to go to a friend's house. He stated that he had not left the house for two days at that point, and he took Ashley to her friend Rachel's house, and he came home.

*[Petitioner] stated that Debbie complained about how he [Petitioner] drove the car when Ashley was in it. He stated that he said that he would kill himself if things were going to be that way. [Petitioner] stated that he grabbed the shotgun and walked to the bathroom. He stated that he fired the shotgun into the bathroom when Debbie was in the shower. He stated that he did not know that the safety was off, and it was an accident. [Petitioner] stated that he was not thinking anything at the time that the gun fired.*

*[Petitioner] stated that he saw that Debbie was shot underneath her stomach. He stated that he dropped the gun, and it fired again and hit Debbie in the back of her head. [Petitioner] stated that he could not stop looking at Debbie. He stated that*

*it was approximately 3:00 to 4:00 p.m., and he thought about Ashley coming home.*

[Petitioner] stated that he tried to close the bathroom door, and he had to pick up the shotgun to close the door. He stated that he wanted to see his father. [Petitioner] stated that he thought that Ashley "couldn't see this," and he started a fire to keep her from coming in the house.

[Petitioner] stated that he drove to his sister's home. He stated that he called his father and said that he needed his father to come to his sister's house. [Petitioner] stated that his father arrived, and he told him everything. [Petitioner] stated, "I was supposed to die that day, not her." He stated, "I thought I did everything [that Debbie wanted him to do]. I thought I was the man she wanted me to be." [Petitioner] stated, "Everyone thought I should get away from her because of the abuse, I didn't think it was much."

(D.I. 19-5 at 687-90) (emphasis added)

### b. **2001 version provided to Dr. Mensch (as summarized in Dr. Mechanick's 2014 report)**

Dr. Mensch noted on 11/10/02 that [Petitioner] reported that the first time the shotgun went off, he never thought he would hit Debbie, and he thought the safety was on. He noted that [Petitioner] reported that the gun fired a second time when he dropped it.

(D.I. 19-5 at 687)

### c. **2003 version provided to Dr. Mensch (as summarized in Dr. Mechanick's 2014 report)**

Dr. Mensch noted on 5/31/03 that [Petitioner] reported that Debbie Clay had been violent to him, and that she would "get up in your face." He noted that [Petitioner] reported that he was drinking on the date of the crime, but he did not feel drunk. Dr. Mensch noted that [Petitioner] reported that he cried a lot, went to Mike's house and saw Debbie's car there. Dr. Mensch noted that [Petitioner] reported that Debbie acted as if nothing had happened when she came home, and they argued. He stated that Debbie said that she "fucked' Mike all the time, and she went to get in the shower.

Dr. Mensch noted that [Petitioner] reported that he grabbed the shotgun, which was loaded from the previous night, and pointed it at the wall and pulled the trigger. He noted that [Petitioner] said he

19

wanted to shoot Debbie, and that he did not know that the safety
was off. Dr. Mensch noted that [Petitioner] reported that he did not
want Debbie to take Ashley away, and he was not going to let that
happen again. He noted that [Petitioner] said that he did not recall
reloading the shotgun. Dr. Mensch noted that [Petitioner] reported
that he walked into the bathroom and saw blood coming out of
Debbie's waist, and that is when the second shot rang out.

(D.I. 19-5 at 687)

### d. 2003 version provided to Dr. Mensch (as paraphrased by post-conviction counsel in 2009)

[Petitioner stated he] grabbed the shotgun. [Petitioner] was in the
hallway, ***pointed the gun to the wall and pulled the trigger.***
[Petitioner stated he] wanted to shoot her. ***Did not know the safety
was on; [he didn't] even know if [he] took the safety off.***
[Petitioner stated he] wanted to shoot her. [He] would not let her
take Ashley away; [he] was not going to let that happen again.

***[Petitioner stated he didn't] recall reloading a round into the
shotgun the second time.*** [He] walked into the bathroom, saw
blood coming out of Debbie's waist. ***That's when the second shot
rang out.***

(D.I 19-5 at 13) (emphasis added)

### e. Dr. Mensch's 2010 Rule 61 testimony about the two versions told to him

[Petitioner's] first version was that it was accidental; and the gun
discharged by dropping it on the floor the second time which,
certainly, that's not how my shotgun works. And the second
[version], it was more intentional; not so much shooting her, but
shooting at her. He was very angry. He still didn't recall, you know,
how he – the second round was chambered, but said that he must
have done it.

(D.I. 19-5 at 299)

### f. Condensed 2013 version provided to Dr. Mechanick

[Petitioner] stated that [the day before the homicide] he blamed Mike
for his problems. He stated that he thought about the shotguns that
were in the truck, and he thought about shooting Mike with them.
[Petitioner] stated that he thought he would catch Mike coming out

20

of the bar and, when Mike went around the side of the bar, he would "blow his fucking head off."

[Petitioner] stated that he wrapped tape around three pillows to use to control the rifle when he put it out the passenger window of his truck to shoot Mike.

\* \* \*

[Petitioner stated that the next day] he drove by Mike's house, and he saw Debbie's car in the driveway. He stated the following: I went home and, when I got home, I was ready. I wanted to kill everybody. I figured I'd get the guns, go back to Mike's house, confront them both, and shoot them.

[Petitioner] stated that he loaded the guns. Petitioner stated that Debbie arrived at her house shortly after he got there. He stated that they argued about Debbie's having been at Mike's house. [Petitioner] stated that Debbie said that she was not at Mike's house, and that Amy had been there. He stated that he told Debbie that he was leaving.

[Petitioner] stated that Debbie undressed and said that she was showering before she went to work. He stated that he knew that this meant Debbie had had sex. [Petitioner] stated that Debbie told him that he would never see Ashley again. He stated that he grabbed a rifle, and shoved it into the pillows. Petitioner stated the following: I wasn't thinking. When she told me I wasn't seeing Ashley, I wasn't going through that no more. I had gone through that with one of my first daughters, Crystal.

[Petitioner] stated that he does not know why *he shot through the pillows.* He stated, "I don't know if it was the fact of keeping Ashley from me, Deb sleeping with Mike, [or] going back to jail." [Petitioner] stated that *he has been told he chambered another round, but he does not remember doing it.*

[Petitioner] stated that Debbie called out, "What'd you do?" He stated that Debbie stepped out of the shower, and he saw blood on her. He stated, *"It [the gun] went off again."* [Petitioner] stated that he felt "numb" at the time, and he does not remember what he was thinking at the time, but "I knew I was mad at her."

(D.I. 19-5 at 697, 699) (emphasis added)

### 3. Superior Court's Rule 61 decisions

The Superior Court denied Claim One in its original 2013 Opinion and in its 2015 Opinion denying Petitioner's Supplemental Rule 61 Motion. In concluding that Petitioner failed to establish deficient performance of defense counsel regarding the EED defense in its 2015 Opinion, the Superior Court found the following:

> I find [Dr. Mechanick's 2014] conclusions unpersuasive and I reject them. Dr. Mensch's notes of his interviews with [Petitioner] on November 10, 2002 and May 31, 20[0]3 indicate that [Petitioner] said that when he pulled the trigger the first time, he thought the safety was on. In substance, he was saying that he thought the gun would not fire because the safety was on. He said the second shot was an accident from his dropping the gun to the floor. Thus, at that point, a month before the trial, [Petitioner] was still clinging to his accident theory. There is simply no reason to believe that [Petitioner] would have abandoned his accident theory if Dr. Mechanick had reinterviewed him on or about May 31, 2003. In his extensive December 16, 2013 interview, it appears that [Petitioner] is no longer asserting the accident theory, thus accounting for Dr. Mechanick's altered opinion.
>
> Trial counsel cannot be found to have been ineffective in 2003 based upon an expert opinion rendered in 2013 which relied in significant part on an altered and far more extensive version of events than [Petitioner] had apparently been willing to give in 2003. Trial Counsel did the best they could to give the jury an opportunity to conclude that [Petitioner] was suffering from EED, but they could not overcome the statement to the police that the shooting was an accident.
>
> In connection with this issue, [Petitioner] also argues that his trial counsel failed to argue other evidence at trial in support of an EED defense, failed to impeach two witnesses, and that the cumulative effect of the EED related factors constituted ineffectiveness.
>
> I find that even if Dr. Mechanick's EED opinion was available in 2003 and the factors mentioned in the preceding paragraph had been pursued at trial, [Petitioner] cannot establish prejudice as that term is used under *Strickland*. The jury would be confronted with the fact that [Petitioner] was giving different versions of how the shooting occurred. There was significant evidence of prior planning, such as the fact that [Petitioner] had retrieved the two guns from another

22

residence the day before, that he had test fired at the water bed the day before, that he had taped pillows to the shot gun to serve as a homemade silencer, and that he had told [A.C.] not to come home on July 6. Dr. Mechanick's current opinion also finds that [Petitioner] had an Anti-social Personality Disorder at the time of the crime. "The State may rebut claims of extreme emotional distress with evidence of anti-social personality disorder." Under all the facts and circumstances, I find that the [Petitioner] has not established that there is a reasonable probability that the new EED evidence would have led to a different result.

(D.I. 17-1 at 50-52)

### 3. Section 2254(d)(2) and the Superior Court's factual findings

Petitioner contends that the Superior Court made the following unreasonable findings of fact when it concluded that defense counsel did not perform deficiently by failing to have Dr. Mechanick re-evaluate Petitioner closer to trial:

1. Petitioner did not change his story from one of an accidental shooting to one of an intentional killing before the trial started.

2. The reason defense counsel did not present expert testimony regarding EED was that Petitioner originally said the shooting was an accident.

3. The version of events Petitioner told Dr. Mensch in 2003 was different from the version he told Dr. Mechanick in 2013.

Pursuant to § 2254(d)(2), the Court must measure the reasonableness of the state court's factual findings against the record evidence at the time of the state court's adjudication. *See Rountree v. Balicki*, 640 F.3d 530, 538 (3d Cir. 2011). The Supreme Court has explicitly left open the question of whether § 2254(e)(1) applies in every case presenting a challenge under § 2254(d)(2). *See Wood v. Allen*, 558 U.S. 290, 300-01 (2010). Since the standard set out in § 2254(e)(1) is "arguably more deferential" than the standard set out in § 2254(d)(2), the Court will "assume for the sake of argument that the factual determination[s] at issue should be review[ed] [] only under § 2254(d)(2) and not under § 2254(e)(1)." *Wood*, 558 U.S. at 300-01. Notably, "a state-court factual

determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first place," and a trial court's factual determination is not unreasonable "even if reasonable minds reviewing the record might disagree about the finding in question." *Id.*

### a. Factual finding that Petitioner did not change his story from an accidental shooting to intentional shooting before the trial started

Petitioner contends that the Superior Court unreasonably determined that he was "still clinging" to his story that the shooting was an accident when the trial started. The intentional/accidental difference is important because the EED defense is not available when the homicide is the result of an accident. (D.I. 19-5 at 96) In this case, since Deborah was shot twice, the circumstances surrounding each shot played a role in determining if the shooting was accidental or intentional.[5] (D.I. 19-4 at 333)

The Superior Court's 2015 decision specifically relied on the two-shot scenario when denying Petitioner's argument in Claim One. Referring to Dr. Mensch's notes from November 10, 2002 and May 31, 2003, the Superior Court explained:

> Dr. Mensch's notes of his interviews with [Petitioner] on November 10, 2002 and May 31, 2003 indicate that [Petitioner] said that when he pulled the trigger the first time, he thought the safety was on. In substance, he was saying that he thought the gun would not fire because the safety was on. He said the second shot was an accident from his dropping the gun to the floor.

(D.I. 17-1 at 51)

Although the record does not contain a copy of Dr. Mensch's notes concerning either version (November 2002 or May 2003) of the shooting, it does contain several summaries about the versions of the story Petitioner provided to Dr. Mensch in 2002 and 2003. The most extensive of those summaries is the one in Dr. Mechanick's report and evaluation from 2014, set forth below:

---

[5]The first shot was "not instantly fatal, nor would it even had been eventually fatal." (D.I. 19-3 at 240) "The second shot, however, was instantly fatal." (D.I. 19-3 at 240)

24

Dr. Mensch noted on 11/10/02 that [Petitioner] reported that the first time the shotgun went off, he never thought he would hit Debbie, and he thought the safety was on. He noted that [Petitioner] reported that the gun fired a second time when he dropped it.

Dr. Mensch noted on 5/31/03 that [Petitioner] reported that Debbie Clay had been violent to him, and that she would "get up in your face." He noted that [Petitioner] reported that he was drinking on the date of the crime, but he did not feel drunk. Dr. Mensch noted that [Petitioner] reported that he cried a lot, went to Mike's house and saw Debbie's car there. Dr. Mensch noted that [Petitioner] reported that Debbie acted as if nothing had happened when she came home, and they argued. He stated that Debbie said that she "fucked' Mike all the time, and she went to get in the shower.

Dr. Mensch noted that [Petitioner] reported that he grabbed the shotgun, which was loaded from the previous night, and pointed it at the wall and pulled the trigger. He noted that [Petitioner] said he wanted to shoot Debbie, and that he did not know that the safety was off. Dr. Mensch noted that [Petitioner] reported that he did not want Debbie to take Ashley away, and he was not going to let that happen again. He noted that [Petitioner] said that he did not recall reloading the shotgun. Dr. Mensch noted that [Petitioner] reported that he walked into the bathroom and saw blood coming out of Debbie's waist, and that is when the second shot rang out.

(D.I. 19-5 at 687)

As the Superior Court correctly noted, the original (2002) and new (2003) versions of the shooting Petitioner provided to Dr. Mensch described the first shot as occurring without Petitioner's knowledge that the gun's safety was off. The Superior Court reasonably reached the decision that Petitioner's statement regarding the safety and the first shot in his 2003 version still demonstrated Petitioner's belief "he thought the gun would not fire because the safety was on." That is, the Superior Court reasonably found that Petitioner was still contending that the shooting was an accident. There is less clarity about the different recitations of what Petitioner said about the second shot – the "dropping gun" description for the second shot was included in the version Petitioner originally provided to Dr. Mensch in 2002 and to Dr. Mechanick in 2001; it was not in the

25

version he provided to Dr. Mensch in 2003.[6]  Still, Petitioner, in his 2003 version of the shooting,

stated that he "did not recall reloading the shotgun" and described the second shot in passive,

accidental terms: "That's when the second shot rang out."  Thus, when viewed in the context of the

overall circumstances, the Superior Court reasonably determined that the description set forth in Dr.

Mensch's notes from May 31, 2003 indicated that Petitioner was still claiming that either or both

shots were accidental in nature.

Petitioner challenges the Superior Court's finding that he did not change his story before the

trial, pointing to Mr. Schmid's and Ms. Carey's inconsistent Rule 61 testimony concerning their

perceptions about whether Petitioner changed his story before or during the trial.  The Court is not

persuaded.  During the various Rule 61 hearings, Petitioner's defense attorneys admitted the

inaccuracy of their memory concerning the actual date on which Petitioner changed his story,[7] and

they indicated that that their confusion was due to the numerous different versions Petitioner

provided prior to trial, as well as the passage of time after the trial.  (D.I. 10-4 at 273-74)  Mr.

Schmid even testified that the dates on the emails would provide a more accurate accounting of the

relevant time-table.  (D.I. 19-6 at 507)

The overall email correspondence between the defense team and the experts demonstrates

that Petitioner repeatedly changed certain aspects of his story from his original version in November

2001 through March 2003.  The closest email to the trial indicating a change in Petitioner's story is

an email dated March 21, 2003 from Ms. Zervas to Drs. Mechanick and Mensch:

---

[6]Indeed, it was the fact that Petitioner did not mention the "dropping gun" description for the
second shot which prompted the defense team to have Dr. Mensch re-evaluate Petitioner in May
2003.

[7]For instance, Ms. Carey testified on six different dates (April 27-29, 2009; May 11, 2009; July 20,
2010; September 23, 2014) and "candidly admitted that her memory was not good about when
Petitioner stated the shooting was not accidental." (D.I. 34 at 4)

> We are fast approaching [Petitioner's] trial (July 7 is jury selection and
> July 14 is trial) . . . so we are reviewing our notes on him . . . . You
> had indicated that no mental defense can be used – and you didn't
> think Extreme Emotional Distress could be used either (given his
> rendition of what had happened = that the gun went off accidently
> etc.). . . . **_He is now indicating that he did deliberately shoot
> thru the bathroom wall (and reportedly used a pillow to buffer
> the sound), he was reportedly surprised it hit her, and then he
> shot her again._** He was very upset that she was going to leave him,
> she was not going to let him see her daughter anymore (she said that
> right before the first shot was fired) and that she was having an affair
> (he had followed her and saw her having sex with someone that
> morning).    I am wondering what you think about his
> abandonment/attachment/dependency issues – and how that might
> have influenced his behavior (i.e., for mitigation) – and if you know
> of any literature that would support this proposition . . . or if this new
> info would change your ideas about using EED?  . . . I had initially
> thought that EED could be used, although I know that you had
> different opinions . . . but even if that defense is not possible, I am
> hoping we can try to explain to the jury how his psychological issues
> could "make sense" of his behavior for mitigation. . . . We really
> have very little else to use – since he gave a confession!

(D.I. 19-7 at 16-17) (emphasis added)  Yet, given Petitioner's tendency to change his description of

the shooting, the Superior Court reasonably relied on the version Petitioner provided closest to the

trial, which was the version Petitioner provided to Dr. Mensch on May 31, 2003.  Consequently, the

defense attorneys' Rule 61 testimony does not provide a reason to doubt the reasonableness of the

Superior Court's factual finding that Petitioner was "still clinging" to his accident version one month

prior to trial.

In short, after viewing the testimony and evidence presented during the entire course of

Petitioner's Rule 61 proceedings in context with the two-shot scenario of the victim's killing, the

Court concludes that the Superior Court did not unreasonably determine the facts by concluding

that Petitioner was "still clinging" to his accident theory at the time of the trial.

27

### b. <u>Factual finding that defense counsel did not put on more evidence about EED from experts because Petitioner originally said the shooting was an accident</u>

In its 2013 Opinion denying post-conviction relief on the EED claim, the Superior Court explained that, "[i]n this case, there were several problems that impeded trial counsel's ability to prepare and present a viable EED defense to the jury." (D.I. 17-1 at 16)

> Initially, it must be noted that the assertion of an EED defense was in inescapable conflict with [Petitioner's] own original account of how the event occurred. The EED defense was also weakened from the outset because there was a videotaped statement from [Petitioner] to the police wherein he claimed the shooting was an accident. [Petitioner] maintained this position from the time of his arrest until the untimely admission to counsel during trial that he did, in fact, intend to shoot the victim. If he had made this revelation before trial, counsel would have been able to more thoroughly investigate and prepare a credible EED defense without committing resources and time to the accident theory. *Although it was later revealed that [Petitioner] made the admission regarding intent to Dr. Mensch in May 2003, [Petitioner's] original representations to both Dr. Mensch (after a ten hour psychological evaluation) and Dr. Mechanick (after a four hour psychiatric examination) that the shooting was an accident meant that neither mental health expert was willing to opine definitively as to EED.*
>
> * * *
>
> *[Petitioner] was unable to secure an expert opinion stating that he was under EED at the time of the shooting because he continually insisted that it was an accident.*

(*Id.* at 16-17, 20) (emphasis added)

In its 2015 Opinion denying Petitioner's EED claim after remand, the Superior Court explained:

> Dr. Mensch's notes of his interviews with [Petitioner] on November 10, 2002 and May 31, 2003 indicate that [Petitioner] said that when he pulled the trigger the first time, he thought the safety was on. In substance, he was saying that he thought the gun would not fire because the safety was on. He said the second shot was an accident from his dropping the gun to the floor. Thus, *at that point, a*

28

> *month before the trial, [Petitioner] was still clinging to his accident theory.* There is simply no reason to believe that [Petitioner] would have abandoned his accident theory if Dr. Mechanick had reinterviewed him on or about May 31, 2003. In his extensive December 16, 2013 interview, it appears that [Petitioner] is no longer asserting the accident theory, thus accounting for Dr. Mechanick's altered opinion.

(D.I. 17-1 at 50-51) (emphasis added)

According to Petitioner, the Superior Court unreasonably found that defense counsel decided to forego putting on more evidence about Petitioner's EED through the expert testimony of Dr. Mechanick due to the fact that Petitioner originally described the shooting as accidental. (D.I. 17 at 30)  Instead, Petitioner contends the real reason defense counsel did not provide additional expert testimony regarding the EED defense was due to their inability to procure funding to have Dr. Mechanick re-evaluate Petitioner, which, in turn, precluded Dr. Mechanick from learning about Petitioner's newest version of the shooting and revising his opinion about the applicability of the EED defense.  (D.I. 34 at 3)

As an initial matter, Petitioner is incorrect that the Superior Court based it factual finding on Petitioner's original version of the shooting as being an accident.  Although the Superior Court refers to Petitioner's original version of the shooting in both of its decisions, its factual finding that Petitioner was "still clinging to his accident theory" one month prior to the trial was based on Petitioner's *continued description* of the shooting as being an accident.

Nevertheless, the record reveals that the limited funding was one of three issues factoring into the defense team's decision over whether to pursue an EED defense: (1) Petitioner's continued description of the shooting in accidental terms caused both experts to doubt the applicability of the EED defense; (2) some of Petitioner's actions prior to the shooting indicated pre-planning and pre-meditation, causing the defense team to doubt the applicability of the EED defense; and (3) there

were not enough funds to continue with both experts.  For instance, the record contains numerous references to both the defense team's and the experts' concern about Petitioner's continued description of the shooting as accidental in nature.  In his 2014 psychiatric evaluation of Petitioner, Dr. Mechanick stated:

> When I interviewed [Petitioner] on November 9, 2001, I did not believe that he accurately provided information about the crime and the circumstances leading up to the crime.  Since [Petitioner] claimed at that time that both discharges of the gun were accidental, I did not believe at that time that Extreme Emotional Distress was applicable.

(D.I. 19-5 at 700)  During the Rule 61 hearing in July 2010, Dr. Mensch testified that Petitioner's initial "description of the event and his description of why it was an accident made me doubt that there was an issue of EED."  (D.I. 19-5 at 239)  Dr. Mensch further testified that Petitioner's:

> first version was that it was accidental; and the gun discharged by dropping it on the floor the second time which, certainly, that's not how my shotgun works.  And the second [version], it was more intentional; not so much shooting her, but shooting at her.  He was very angry.  He still didn't recall, you know, how he -- the second round was chambered, but said that he must have done it.

(D.I. 19-5 at 299)  When asked if he had ruled out EED as a viable defense by the time the trial was over, Dr. Mensch replied, "I hadn't ruled it out.  I just -- I had doubts as to whether that was an appropriate defense."  (D.I. 19-5 at 259)  When post-conviction counsel asked Dr. Mensch if he knew why he had not been asked to testify at the guilt phase, he replied, "[M]y impression is that -- my initial cut, that there is, quote, no mental defense or extreme emotional distress may have triggered, you know, that thought in the attorneys, that they were not going to have me testify in the trial phase."  (D.I. 19-5 at 241)

The following excerpts from Petitioner's May 2009 Rule 61 hearing demonstrate why the defense attorneys viewed the consistent accidental tone in Petitioner's versions as precluding an

EED defense.  For instance, when asked if either Dr. Mechanick or Dr. Mensch provided an opinion as to whether EED was a valid defense in Petitioner's case, Mr. Schmid responded:

> At no stage did anyone say: Well, yes, I have enough information to be able to render an opinion that in this case extreme emotional distress is an appropriate defense.
>
> It was always predicated with: Well, if he will relay to us that he intentionally shot her, that it was met, then they would be able to proceed.

(D.I. 19-5 at 84)  When asked, "You said you would have liked [Dr. Mechanick] to have addressed EED, does that mean if you could have gotten an opinion you could have used," Mr. Schmid responded "Yes."  (D.I. 19-5 at 84)  When asked why the defense did not ask Dr. Mechanick to write a report, Mr. Schmid explained:

> Given that at that stage Dr. Mechanick was not providing anything that was useful, we, at that point in time, did not believe it appropriate to have him memorialize any of those opinions and, thus, make it subject to potential discovery.

(D.I. 19-5 at 87)

The State continued to question Mr. Schmid about the EED defense as follows:

> **State:**  Did [Petitioner's] story about what happened at the time of the actual killing change during the period of time that you consulted with him?
>
> **Schmid:**  Yes, it did.  We started with the story from the [police] statement that was videotaped in which, as I recall, [Petitioner] indicated that he had dropped the firearm, being in shock when he saw that Debbie had been struck in the abdomen, and that the weapon had discharged.
>
> He much later on, closer to trial, indicated a flinch response when he came around the corner and found that Debbie had been shot and that, in flinching, while holding the gun that it had been accidentally discharged.
>
> He talked about a suicide attempt the evening before in which the waterbed had been damaged.

31

Those are some of the salient changes.

**State:**  At first he said the first shot was an accident, too, right?

**Schmid:**  No.  What he said was that with the first shot – he was going down the hall with an intention to kill himself and pointed the gun at her – pointed the gun at the shower enclosure through the wall over a washer, and that it had gone off.

**State:**  Right.  You are talking about in the statement to the police, right?

**Schmid:**  Yes.

**State:**  Did he change that, what he said about that first shot?

**Schmid:**  That, in anger, he went – as he's going down the hall, he pointed and pulled the trigger, that it wasn't an accident.   He maintained he was still surprised that she had been struck.

One can only presume he anticipated that the shotgun discharge going through the wall past her would startle her and show how angry he was.

**State:**  With regard to the first shot, he tells the police, essentially, he's going down the hall to kill himself, the gun goes off – he points the gun, the gun goes off?

**Schmid:**  Yes.

**State:**  He changes that somewhat and says to you that he pointed it in anger, but still doesn't say he was trying to kill her?

**Schmid:**  Correct.

**State:**  With regard to the second shot, he tells the police he drops the gun, it fires.  He tells you that he comes around the corner, he flinches, and the gun fires?

**Schmid:**  Yes.

**State:** Did he ever tell you that he fired the second shot intentionally, if you remember?

**Schmid:**  I don't believe he did.

32

**State:**   Now, you have been asked about EED defense.   What problems did you see with presenting an EED defense?

**Schmid:**  Well, I think that it's illustrated by the responses of both Dr. Mechanick and Dr. Mensch.

Dr. Mechanick focused on and was concerned about the fact that at no point did [Petitioner] say: I just got so angry and so overwhelmed with frustration, or whatever the emotion was, that I shot her and killed her, I wished I hadn't done it, but that's what I did.   Dr. Mechanick was focused on the lack of final intent to cause her death.

Dr. Mensch, on the other hand – this is something that I had also discussed – was concerned because the shotgun was a bolt action shotgun.   Meaning that in order to cycle the weapon – and it would have a magazine.   And you would have to cycle the bolt, lift it up, pull it back, push it forward in order to chamber a round.

And then, once you have pulled the trigger and it discharges, you would have to repeat the same procedure; to lift up the bolt, pull it back, let the spent round eject, and push it forward.

And Dr. Mechanick and I were both concerned about the fact that this would make it – that it required too much action, too much intent, too much forethought – that it was too much of an intentional act outside the realm of consciousness.

\* \* \*

**State:**  Do I understand that he never told you that he intentionally shot to kill her?

**Schmid:**  I don't recall that he did.   He did state at one point, during the guilt phase or immediately prior to, I think that's what it was, that he hadn't told us everything.   He wouldn't go beyond that.

(D.I. 19-5 at 95-96)

The defense team's decision to forego having Dr. Mechanick re-evaluate Petitioner was not based only upon Petitioner's continued description of the shooting in accidental terms.   The record reveals that the defense team was also concerned that some of Petitioner's activities prior to the shooting could be characterized as "evidence of planning in advance of the shooting," which

33

"complicate[d]" the situation surrounding the EED defense.  (D.I. 19-5 at 129)  For instance, when

discussing why the defense team did not have Dr. Mechanick explore the applicability of the EED

defense, Mr. Schmid stated:

> I think *we made a determination based on the aggregate,*
> *including the factors that would have complicated our*
> *presentation of an EED defense which, in fact, did; those*
> *including the evidence of pre-planning; the actions of the night*
> *before concerning firing, as I recall, two rounds through the*
> *water bed.  In other words, there were complicating factors.*
>
> There were difficulties with respect to [Petitioner] changing his story.
> I think all of those went into the decision also.  Whether, in fact, we
> could have received enough additional support from Dr. Mechanick,
> I think that may have been a part of the calculation.

(D.I. 19-5 at 131) (emphasis added)  Ms. Carey identified the taped pillows as an additional

complication, because they were evidence of premeditation.  (D.I. 19-5 at 207)

The record indicates that limited funding also influenced the defense team's decision to

forego pursuing an EED defense any further with Dr. Mechanick.  During Petitioner's Rule 61

hearings, Mr. Schmid and Ms. Carey testified that they would have had Dr. Mechanick re-evaluate

Petitioner closer to the trial date but lacked the funding to do so.  (D.I. 19-5 at 61)  During the July

2010 Rule 61 hearing, post-conviction counsel questioned Mr. Schmid extensively about the lack of

funding for additional psychological evaluations and how that lack of funding affected the defense

team's ability to present an EED defense.  (D.I. 19-5 at 104-09)  Mr. Schmid stated that he had been

unable to obtain funding for Dr. Mechanick to see Petitioner a second time.  (D.I 19-5 at 104)

Although the defense obtained one continuance in order to obtain funding, Mr. Schmid could not

recollect if the defense team had any particular tactical or strategic reason to not request a second

continuance in order to obtain additional funding.[8] *Id.* However, Mr. Schmid further explained, "I think, in addition to the funding issue, though, there was also a question about what his story was, and the extent that Dr. Mechanick felt that he was going to be able to offer any helpful testimony at that stage when we had some funding available." (D.I. 19-5 at 120-21) Ms. Carey also summarized the situation as follows:

> In the beginning we were trying to explore multiple mental health defenses and, then, we narrowed it down. And we were still – in 2003 still trying to get an expert. But, I mean, we couldn't get an expert on board, you know, I don't even think if we had the funding at the time.

(D.I. 19-5 at 208)

The foregoing record demonstrates that the defense team's decision to not have Dr. Mechanick re-evaluate Petitioner in the spring of 2003 in order to pursue the possibility of him testifying about the existence of EED was based on three factors, with the continued accidental tone of Petitioner's ever-changing story being one of those factors. When viewed in the context of all of the record evidence, the Superior Court reasonably determined that Petitioner's continued description of the shooting as accidental constituted the main roadblock to having Dr. Mechanick re-evaluate Petitioner; the limited funding was a side issue. This conclusion is supported by the record, including that the majority of post-conviction counsel's questions during the Rule 61 proceedings focused on the accidental/intentional distinction between Petitioner's versions, and not on the issue of limited funding.[9]

---

[8]Petitioner's post-conviction counsel asked, "So, because of inadequate funding you were unable to explore EED with Dr. Mechanick for the guilt phase, Correct?" (D.I. 19-5 at 107) Mr. Schmid responded, "Correct." (*Id.*)

[9]Moreover, Petitioner fails to acknowledge that the defense team actually procured additional funding to have Dr. Mensch re-evaluate Petitioner in May 2003. (D.I. 19-5 at 85, 106-08; D.I. 19-7 at 20-21, 25-26)

Based on the foregoing, the Court concludes that the Superior Court reasonably determined the facts in finding that the accidental tone of Petitioner's continually-changing story constituted the main reason for the defense team not pursuing the additional expert testimony of Dr. Mechanick on the applicability of the EED defense.

### c. Factual finding that the version Petitioner told Dr. Mensch in 2003 was different than the version he told Dr. Mechanick in 2013

In his 2014 Report, Dr. Mechanick asserts,

> [Petitioner's] account of the crime when Dr. Mensch reexamined him on May 31, 2003 is consistent with the information that [Petitioner] provided to me on December 16, 2013. It is my opinion that, if I had reexamined [Petitioner] on or about the time of Dr. Mensch's May 31, 2003 examination, [Petitioner] would have provided information to me at that time that was similar to and consistent with what he told me on December 16, 2013. It is my opinion that, if [Petitioner] had provided me with that information, I would have reached the same opinions at that the time of trial that I am stating in my current report.

(D.I. 19-5)

In its 2015 Rule 61 decision, the Superior Court rejected Dr. Mechanick's assertion, explaining:

> Dr. Mechanick concludes that [Petitioner's] account of the crime given to Dr. Mensch on May 31, 2003 is consistent with the account given Dr. Mechanick on December 16, 2013. He further concludes that if he had examined [Petitioner] on or about May 31, 2003, [Petitioner] would have given him an account which was consistent with what he told Dr. Mechanick on December 1, 2013.
>
> I find these conclusions unpersuasive and I reject them. [] In his extensive December 16, 2013 interview [with Dr. Mechanick], it appears that [Petitioner] is no longer asserting the accident theory, thus accounting for Dr. Mechanick's altered opinion.
>
> Trial counsel cannot be found to have been ineffective in 2003 based upon an expert opinion rendered in 2013 which relied in significant

36

> part on an altered and far more extensive version of events than [Petitioner] had apparently been willing to give in 2003.

(D.I. 17-1 at 51)

Petitioner contends that the Superior Court unreasonably determined the facts by concluding that the "version of events [Petitioner] gave Dr. Mensch in 2003 was different than the version he gave Dr. Mechanick" – presumably during Dr. Mechanick's re-evaluation in 2013. (D.I. 17 at 31) Petitioner bases this argument on the following factors: (1) Petitioner told both Dr. Mensch (in 2003) and Dr. Mechanick (in 2013) that he wanted to shoot Debbie, which demonstrated his intent to shoot her; and (2) what he told Ms. Zervas in 2002 is consistent with what he told Dr. Mechanick in 2013, namely, that he grabbed the shotgun out of the closet and "INTENTIONALLY pointed it at the bathroom wall and fired it." (D.I. 17 at 31)

To begin, since the issue is whether the information Petitioner provided to Dr. Mechanick in 2013 was consistent with the information Petitioner provided to Dr. Mensch in 2003, the version Petitioner told Ms. Zervas in 2002 is irrelevant when assessing the reasonableness of the Superior Court's factual finding. In turn, even though Petitioner indicated his intent to shoot the first shot in his 2003 version to Dr. Mensch and in his 2013 version to Dr. Mechanick (D.I. 19-6 at 112), the 2013 version provided to Dr. Mechanick included many more details than the May 2003 version to Dr. Mensch about Petitioner's state of mind, which provided a fuller picture of Petitioner's emotional distress. For example, the 2013 version Petitioner provided to Dr. Mechanick included, *inter alia*, the following information: (1) Debbie told Petitioner she had been in a relationship with someone else while he was in prison, and she would not tell him the status of that relationship; (2) Petitioner followed Debbie in March and April and felt like he was losing his mind; (3) he started drinking earlier in the day so that he would not have to deal with what was happening with Debbie, to calm down, and to drown out the feeling he was having; (4) he was frustrated about not knowing

37

what was happening with Debbie – she kept denying seeing someone else, but she was coming home later and later; (4) he saw Mike Ratledge kiss Debbie on the lips; (5) a neighbor informed Petitioner that Mike's van was in Debbie's yard a lot; (6) Petitioner started thinking about killing Mike; (7) Petitioner started drinking more than he should; (8) Petitioner found out he had violated his probation and was incarcerated for two weeks; (9) when he returned from prison, Petitioner and Debbie "cleared the air" and everything looked good – Petitioner did not have that sick feeling; (10) Mike asked to meet with Petitioner and told Petitioner he wasn't having sex with Debbie; (11) things with Debbie got worse and they discussed Petitioner moving out; and (12) Petitioner's probation officer told Petitioner he could not move from Debbie's house. Based on the significant amount of new details in Petitioner's 2013 version of the shooting, the Superior Court reasonably determined that Petitioner's 2013 version to Dr. Mechanick was different from his 2003 version to Dr. Mensch.

Given the reasonableness of the Superior Court's finding that Petitioner's 2013 version was "altered and [a] far more extensive version of events than [Petitioner] had apparently been willing to give [to Dr. Mensch] in 2003," the Court further concludes that the Superior Court reasonably found that Dr. Mechanick would not have been able to opine that Petitioner was suffering EED at the time of the homicide if he had either had access to Dr. Mensch's notes from 2003 or if he had been able to examine Petitioner in May or June 2003. (D.I. 17-1 at 50-51) Notably, during the Rule 61 hearing in 2009, Dr. Mechanick was apprised of the contents of Dr. Mensch's notes from 2003, and stated that he still could not provide an opinion that Petitioner was suffering from EED based on those notes. (D.I. 19-5 at 13-15) During the Rule 61 hearing in 2011, Dr. Mechanick was presented with Ms. Zervas' email from March 21, 2003 describing Petitioner's most recently-changed story. When asked if Ms. Zervas' email was enough for him to change his opinion about EED, Dr. Mechanick replied:

> What I would say is that I don't believe that simply the e-mail
> transmission about that version of events that – combined with what
> I had up to that point would have reached the – crossed the
> threshold where I believe that I could have reached the opinion that
> he had EED.

(D.I. 19-5 at 349-50)  In her March 21, 2003 email, Ms. Zervas explained that Petitioner was now

asserting he "deliberately" shot through the bathroom wall and used the pillow as a "buffer."  (D.I.

19-7 at 16)  Ms. Zervas' March 21, 2003 email description of Petitioner's "newest-at-that-time'

version of the shooting contained more background information and used more "intentional" terms

(D.I 19-7 at 16-17) than did Dr. Mensch's notes concerning the version Petitioner provided on May

31, 2003, which still contained Petitioner's statement that he did not know the safety was off (D.I.

19-5 at 687; *see also supra* at 25, 27).  Given Dr. Mechanick's unwillingness to opine that Petitioner

had EED when presented with Ms. Zervas' March 21, 2003 description of the shooting as more

"intentional," it would be incorrect to conclude that Dr. Mechanick would have been willing to

opine that Petitioner had EED on the basis of Dr. Mensch's May 31, 2003 notes.  Relatedly, the

record is devoid of any indication that Petitioner would have presented a more detailed version of

the shooting to Dr. Mechanick in May or June 2003 than the one he actually provided to Dr.

Mensch in May 2003.  Consequently, it was reasonable for the Superior Court to conclude that Dr.

Mechanick would not have changed his opinion on the availability of the EED defense if he had re-

evaluated Petitioner in May or June of 2003, because there "is simply no reason to believe that

[Petitioner] would have abandoned his accident theory if Dr. Mechanick had reinterviewed him on

or about May 31, 2003."  (D.I. 17-1 at 51)

After viewing the testimony and evidence presented during the entire course of Petitioner's

Rule 61 proceedings in the full context with the two-shot scenario of the victim's killing, the Court

concludes that the Superior Court reasonably made the following factual determinations:

(1) Petitioner was "still clinging" to his accident theory at the time of Petitioner's trial;

(2) Petitioner's description of the shooting in accidental terms was the primary reason the defense did not pursue having Dr. Mechanick provide expert testimony regarding the EED defense; and

(3) the version of events Petitioner told Dr. Mechanick in 2013 was "an altered and far more extensive version of events than [Petitioner] had apparently been willing to give in 2003."

### 4. Section 2254(d)(1) and the Superior Court's application of *Strickland*

Petitioner contends that the Superior Court's denial of Claim One was based upon an unreasonable application of *Strickland* under § 2254(d)(1) because defense counsel failed to adequately investigate and present evidence in support of Petitioner's defense that the homicide occurred while he was under EED. Petitioner focuses on the defense team's failure to have Dr. Mechanick evaluate Petitioner a second time closer to trial to see if he could give an opinion that Petitioner was under EED at the time of the shooting. According to Petitioner, the defense team did not have a reasonable tactical or strategic reason for failing to have Dr. Mechanick re-evaluate Petitioner; rather, their failure to pursue that re-evaluation was due to a lack of funding and a failure to seek such funding from the trial court.

It is well-settled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. However, defense counsel's strategic choices may still amount to deficient performance where there has been a failure to conduct a reasonable investigation before deciding on a particular strategy. *See id.* at 690-91. The Third Circuit recently elaborated on counsel's duty to make investigations, explaining that "[c]ounsel can make a strategic decision to halt an avenue of investigation to reach that decision, but decisions not to investigate certain types of evidence cannot be called 'strategic' when counsel fails to seek rudimentary background information." *Salaam v. Sec'y of Pennsylvania Dep't Corrs.*, 895 F.3d

40

254, 268 (3d Cir. 2018). The Court's "principal concern in deciding whether [counsel] exercised reasonable professional judgment is . . . whether the investigation supporting counsel's decision not to introduce mitigating evidence [here, of Petitioner's EED[10]] was itself reasonable." *Wiggins*, 539 U.S. at 522-23.

Turning first to *Strickland*'s performance prong, the Court concludes that defense counsel did not perform deficiently by failing to have Dr. Mechanick reevaluate Petitioner closer to the start of the trial. The record demonstrates that defense counsel diligently investigated potential mitigating factors by considering and exploring several different possible defenses. Among those defenses that counsel considered in preparing for trial was the affirmative defense of EED,[11] which would reduce the severity of punishment for the homicide from that for first degree murder to that for

---

[10] "The fact that the accused intentionally caused the death of another person under the influence of extreme emotional distress is a mitigating circumstance, reducing the crime of murder in the first degree as defined by § 636 of this title to the crime of manslaughter as defined by § 632 of this title." 11 Del. C. § 641.

[11] *See* 11 Del. C. § 641; 11 Del. C. § 632(3). In Delaware,

> [t]he defense of "extreme emotional distress" is one which may apply where the defendant intentionally causes the death of another. If the defense is established by the defendant by a preponderance of the evidence, the crime of murder in the first degree is reduced to manslaughter.
>
> . . . [I]n addition to proving by a preponderance of the evidence that he acted under the influence of "extreme emotional distress," the defendant must "prove by a preponderance of the evidence . . . a reasonable explanation or excuse for the existence of extreme emotional distress. . . . The reasonableness of the explanation . . . shall be determined from the viewpoint of a reasonable person in the accused's situation under the circumstances as he believed them to be."

*State v. Gattis*, 2011 WL 1458484, at *9 (Del. Super. Ct. Mar. 22, 2011), *aff'd*, 32 A.3d 988 (Del. 2011). Raising the affirmative defense of extreme emotional defense to murder constitutes an admission of culpability on the death. *See Ross v. State*, 768 A.2d 471 (Del. 2001).

manslaughter. Defense counsel retained and consulted with two mental health experts – Dr. Mechanick, a psychiatrist, and Dr. Mensch, a psychologist – to aid in this investigation. Drs. Mechanick and Mensch were initially asked to consider all possible defenses and, later on, they were specifically asked to consider if EED and the theory of abandonment homicide would be available. (D.I. 19-4 at 229; D.I. 19-5 at 40, 86, 104, 237)

After performing their initial evaluations, Drs. Mechanick and Mensch both stated that they could not opine that Petitioner was under EED at the time of the crime. Petitioner continued to alter his story about the shooting. Four months before trial, Petitioner's story had changed enough to warrant a further inquiry into the availability of the EED defense. At that point, the defense team provided both experts with the details of Petitioner's new version of the shooting – but, even then, neither expert was willing to give a definite opinion on the availability of the EED defense on the basis of the email. Nevertheless, the defense team was interested in determining if an in-person evaluation with Petitioner could result in one or both of the experts changing their opinion on the viability of an EED defense. Given funding limitations and rules prohibiting duplicative mental health assessments, the defense team could not retain both experts to re-evaluate Petitioner. They did, however, obtain sufficient additional funding to have Dr. Mensch re-evaluate Petitioner. Prior to Dr. Mensch's re-evaluation, and given the doctor's doubt about the applicability of the EED defense, the defense team asked Dr. Mensch to determine the appropriateness of other mental defenses, with a particular emphasis on abandonment homicide. After meeting with Petitioner and reviewing Petitioner's records, Dr. Mensch informed defense counsel that, with respect to the abandonment homicide theory, he could establish a connection "between the homicide and the earlier issues in [Petitioner's] life." (D.I. 19-7 at 29)

Contrary to Petitioner's assertion, the fact that limited funding resulted in the defense team only retaining one of the mental health experts to re-evaluate Petitioner does not demonstrate that the defense team's failure to proceed with Dr. Mechanick was unreasonable or constituted deficient performance. The Constitution does not mandate that an indigent criminal defendant be able to retain the expert of his choosing, only that a competent expert be made available "who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). In *Hinton v. Alabama*, 571 U.S. 263, 273-74 (2014), the Supreme Court addressed the issue of when an attorney's choice of an expert based on funding limitations may be deemed deficient, explaining that

> the inadequate assistance of counsel we find in this case does not consist of the hiring of an expert who, though qualified, was not qualified enough. The selection of an expert witness is a paradigmatic example of the type of strategic choice that, when made after thorough investigation of the law and facts is virtually unchallengeable. We do not today launch federal courts into examination of the relative qualifications of experts hired and experts that might have been hired. The only inadequate assistance of counsel here was the inexcusable mistake of law – the unreasonable failure to understand the resources of state law made available to him – that caused counsel to employ an expert that **he himself** deemed inadequate.

However, the Supreme Court has also opined that, "[r]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

Notably, Petitioner does not assert, and the record certainly does not suggest, that Dr. Mensch was unqualified or inadequate to render a professional opinion regarding the mental defenses available to Petitioner. Nor is this a case where, as in *Hinton*, defense counsel's failure to obtain funding for an additional expert was due to defense counsel's mistaken belief that additional funding was not available. In fact, although the limited availability of funds prevented the defense

43

team from proceeding with two experts, the defense team requested and successfully obtained additional funds for one expert, Dr. Mensch, to re-evaluate Petitioner on May 31, 2003.

Defense counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 108; *see also Babbit v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) ("[C]ounsel could reasonably have decided to utilize his limited resources in investigating other avenues rather than simply bolstering this one."). As reasonably determined by the Superior Court, it was Petitioner's description of the shooting in accidental terms that prevented Dr. Mensch from providing an opinion that Petitioner was under EED at the time of the crime. The Superior Court also reasonably determined that there is no reason to believe that Dr. Mechanick would have been able to support an EED defense even if he had re-evaluated Petitioner in May or June of 2003. When viewed in context with all of the circumstances at the relevant time (2001-2003), defense counsel's decision to forego pursuing an additional evaluation from Dr. Mechanick – which, given Dr. Mensch's conclusion, was likely to result with Dr. Mechanick still maintaining his inability to opine on the availability of the EED defense – represents a tactical decision about the allocation of limited trial resources. Additionally, the fact that defense counsel asked Dr. Mensch to consider the existence of a substitute viable defense in lieu of the determined-to-be-inapplicable EED defense demonstrates that defense counsel reasonably investigated their options before deciding to forego pursuing an unattainable expert opinion from Dr. Mechanick. For all of these reasons, the Court concludes that Petitioner has failed to make the requisite showing of deficient performance with respect to Claim One.

Having determined that defense counsel did not perform deficiently, the Court need not address the issue of prejudice. Nevertheless, the Court further concludes that Petitioner has not demonstrated *Strickland* prejudice resulting from defense counsel's failure to have Dr. Mechanick re-

44

evaluate Petitioner in an attempt to obtain an expert opinion that Petitioner was under the influence of EED at the time of the homicide. The Superior Court's objectively reasonable factual determination that Dr. Mechanick would not have been able to provide an EED defense on the basis of the version of the shooting that Petitioner provided to Dr. Mensch in May 2003 leads to the conclusion that Petitioner cannot show a reasonable probability that Dr. Mechanick's testimony would have made any material difference in the outcome of the case or the length of his sentence.

Even if Dr. Mechanick's EED opinion from 2014 was available during Petitioner's trial in 2003, Petitioner still cannot establish prejudice under *Strickland*. As § 641 makes clear, to raise an EED defense, the accused must prove by a preponderance of the evidence a "reasonable explanation" in the form of a "provocation, event or situation" that causes the distress. When presenting the EED defense, expert psychological testimony may, in some cases, be helpful in explaining why a particular defendant reacted in a certain way; however, EED is not purely a mental illness defense. Rather, to present a viable EED defense, the defense must establish that there is a reasonable explanation for the violent outburst by showing that the defendant was provoked by an exceptional event or situation. *See Moore v. State*, 456 A.2d 1223, 1226 (Del. 1983).

Petitioner contends that the following evidence supporting the EED defense would have been readily available if defense counsel had arranged for Dr. Mechanick to re-evaluate him, and that the Superior Court overlooked these facts when assessing prejudice under *Strickland*: Deborah was having an affair with Mike Ratledge; Deborah belittled Petitioner and demanded that he leave the home when he was on house arrest; Deborah went into the shower, which was something she typically did after sex; and Deborah told Petitioner on the day of the shooting that he would never see Ashley again. (D.I. 17 at 14, 17) Petitioner, however, misrepresents the record. The Superior Court acknowledged both the evidence presented at trial and the "new" evidence of EED that

45

Petitioner presented in the Rule 61 proceedings, but found there were "significant facts in the record that are inconsistent with the theory that [Petitioner] was under 'extreme emotional distress,' and more in accord with the converse notion that the killing involved premeditation and substantial planning." (D.I. 17-1 at 18-19)  The evidence of Petitioner's pre-planning – obtaining the guns and lying to Brock about having them in his possession, test firing the shotgun into the waterbed the day before, attempting to muffle the sound of the gun blast with pillows duct-taped together – along with the attempt to avoid detection after the homicide by setting fire to the house and fleeing, provided strong evidence working against any assertion that Petitioner's conduct was a sudden emotional response.

In addition, EED is a legal, not a psychological, construct.  *See Cruz v. State*, 12 A.3d 1132, 1136 (Del. 2011); D.I. 19-6 at 44.  A jury may reject a medical expert's opinion about the existence of EED if the opinion seems unreasonable or there is other contrary evidence.  In this case, there was such contrary evidence.  Along with evidence of pre-planning and attempts to avoid detection (as described above), there was the videotape of Petitioner's July 2001 statement to the police that the shooting was an accident.  Given the strength of all of this contrary evidence, Petitioner cannot demonstrate a reasonable probability that a reasonable jury would have accepted an EED even if supported by an expert medical opinion.  Additionally, presenting an inconsistent EED defense via expert testimony had the potential of undermining Petitioner's credibility for the penalty phase, a very real concern in a capital case.

Finally, despite not having an expert willing to present the EED defense, the defense team presented the background information supporting an EED defense during the guilt phase, primarily through the testimony of Deborah's daughter, Ashley.  The defense strategy at this point was to "leave the door open" and present the information indicating the existence of EED, request an

46

instruction on EED and then, at the penalty phase, use all of the information that had been presented to the jury during the guilt phase. (D.I. 19-5 at 203) The record reveals that the defense team implemented its strategy, and even succeeded in obtaining a jury instruction on EED. Defense counsel's failure to get a manslaughter verdict on the basis of EED was not due to defense counsel's ineffective assistance but, rather, due to the overwhelming incriminating evidence against Petitioner.

In sum, looking at the Delaware Supreme Court's denial of Claim One through the doubly deferential lens applicable on habeas review, the Court concludes that the Superior Court reasonably applied *Strickland* in holding that defense counsel did not provide ineffective assistance by failing to have Dr. Mechanick re-evaluate Petitioner closer to trial in order to present additional evidence that Petitioner was suffering from EED at the time of the shooting. Accordingly, the Court will deny Claim One for failing to satisfy §§ 2254(d)(1) and (2).

## C. Claim Two: Impeachment Of Witnesses

The State presented two witnesses during the guilt phase – Amy Rust and Mike Ratledge – to diminish the effect of the evidence presented in support of EED. (D.I. 17 at 25) Ms. Rust was Deborah's friend and testified that she had not seen Petitioner having emotional difficulties. Before Ms. Rust testified, the State revealed that she had previously used an alias, Faith Cahill, and that she had an eight-year old conviction for knowingly inserting false information on the face of temporary registration. Mr. Ratledge had had a sexual relationship with Deborah, but when he testified, he denied that he was having such a relationship with Deborah during June 2001, the month before the homicide. (D.I. 17 at 25) Mr. Ratledge had been arrested over twenty times, some of them crimes of dishonesty, and also had a pending case against him at the time the police questioned him in relation to this case. (D.I. 17 at 25-26)

47

In Claim Two, Petitioner contends that defense counsel provided ineffective assistance because they had no strategic reasons for not impeaching the two witness' credibility and honesty with their criminal history. Although the Superior Court did not independently address the allegations in Claim Two, it did deny Claim Two as part of its overall prejudice ruling with respect to its denial of Petitioner's Supplemental Rule 61 Motion in 2015.

After reviewing the record, the Court concludes that Petitioner has failed to demonstrate that the Superior Court's decision was based upon an unreasonable application of *Strickland*. First, the record reveals that defense counsel knowingly chose not to impeach Ms. Rust with her eight-year old offense after learning that the offense was not a felony. (D.I. 19-1 at 524) The record also reveals that defense counsel attempted to demonstrate Ms. Rust's bias against Petitioner by questioning her about certain activities she had engaged in, to show that Ms. Rust "was encouraging Debbie Clay to break up with [Petitioner] and see Mike Ratledge." (D.I. 19-1 at 527-530) The State objected, and in sustaining that objection, the trial court stated:

> Here's the thing. You know this witness has testified that Debbie Clay was her best friend, and in fact, she offered that testimony through tears. That she spoke with her that day several times. She testified that she didn't like [Petitioner] and [Petitioner] didn't like her. So I think her bias to some degree is established.

(D.I. 19-1 at 530-31) However, Ms. Rust also testified that Deborah, on the day she was murdered, told her she was with Mr. Ratledge, and that she had sexual relations with Mr. Ratledge. (D.I. 19-1 at 514-15, 538) Ms. Rust testified that Deborah and Mr. Ratledge had been seeing each other since before Petitioner and Deborah were living together in June, 2003, and that Mr. Ratledge "was her boyfriend now." (D.I. 19-1 at 514-15, 534) As discussed below, Petitioner also asserts that defense counsel should have impeached Mr. Ratledge with respect to his denial that he had a sexual relationship with Deborah during the months leading up to the homicide. (D.I. 19-1 at 550) To the

48

extent Ms. Rust's testimony directly contradicted Mr. Ratledge's denial, refraining from impeaching her credibility would appear to have a more beneficial effect for Petitioner's purpose. Regardless, Petitioner fails to demonstrate, and nothing in the record suggests, that there was a reasonable probability that the outcome of Petitioner's trial would have been different but for defense counsel's failure to impeach Ms. Rust with the fact that she falsified information on a temporary tag eight years prior to Petitioner's trial.

As for Mr. Ratledge, he testified during direct examination that he met Deborah when she was a bartender at Oaks Tavern four or five years prior to her murder, but that he had not seen her for the entire month of June. (D.I. 19-1 at 547, 550)  He also testified that, although he had sexual relations with Deborah on the day she was murdered, they had not been having a sexual relationship "for a couple of months" prior to July 6, 2003. (D.I. 19-1 at 550)  Upon finishing its direct examination of Mr. Ratledge, the State informed defense counsel that Mr. Ratledge had informed them during trial prep that he (Ratledge) had been intimate with Deborah several times in June. (D.I. 19-1 at 558)  On cross-examination, Mr. Ratledge admitted his memory regarding the dates and times had varied somewhat. (D.I. 19-1 at 564-67)  At the conclusion of the cross-examination, defense counsel requested the trial court leave Mr. Ratledge under subpoena because, "I think it would be necessary, under the circumstances, to call him again." (D.I. 19-1 at 584)

As Mr. Schmid explained during the Rule 61 hearings:

> Well, first of all, it is true the record was not provided to us until after the witnesses had left the stand.
>
> But in any case we had plans on calling the witnesses in our own case. And I certainly didn't want to be in the position to impeach the witnesses and, then, seek to use them in our case should that come to pass. We felt pretty certain we were going to.

(D.I. 19-5 at 99)  Given their intent to call Mr. Ratledge in the defense case, defense counsel had an objectively reasonable strategic reason for electing not to impeach Mr. Ratledge with his criminal history.  Petitioner has also failed to demonstrate that he was prejudiced by defense counsel's failure to impeach Mr. Ratledge in this manner.

Thus, the Court concludes that the Superior Court did not unreasonably apply *Strickland* in rejecting Petitioner's argument regarding defense counsel's failure to impeach Ms. Rust and Mr. Ratledge.

## V.     CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability.  *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2).  A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has concluded that the instant Petition does not warrant relief.  Reasonable jurists would not find this conclusion to be debatable.  Accordingly, the Court will not issue a certificate of appealability.

## VI.    CONCLUSION

For the reasons discussed, the Court concludes that the Petition must be denied.  An appropriate Order will be entered.